**Tim Jones**, OSB No. 890654
TIM JONES P.C.
2855 NW Crossing Dr., Suite 213
Bend, OR 97703
Tel: (503) 374-1414
tim@timjonespc.com

**Nadia H. Dahab**, OSB No. 125630
SUGERMAN DAHAB
101 SW Main Street, Suite 910
Portland, Oregon 97204
Tel: (503) 228-6474
nadia@sugermandahab.com

*Attorneys for Claimant Melodie Jackson*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| In The Matter Of:<br><br>THE COMPLAINT OF MARION COUNTY, as owner and operator of the Ferry BUENA VISTA for Exoneration from or Limitation of Liability,<br><br>PETITIONER. | IN ADMIRALTY<br><br>Case No. 6:25-cv-00782-MC<br><br>**CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS**<br><br>**ORAL ARGUMENT REQUESTED** |

Claimant Melodie Jackson, as personal representative of the Estate of Jacob Jackson

("Dr. Jackson"), and Claimant Alex Woolner ("Woolner" and, collectively with Dr. Jackson,

"Claimants") jointly offer the following response in opposition to Petitioner Marion County's

("the County's") Motion to Dismiss ("the motion"). This response is supported by the

Declarations of Tim Jones and Captain Katharine Sweeney, both filed concurrently herewith.

PAGE 1 – CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION
COUNTY'S MOTION TO DISMISS

For the reasons set forth below, the motion is procedurally improper, and in any event federal admiralty jurisdiction exists in this case. The motion should be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the tragic death of Dr. Jacob Jackson, who was killed in June 2024 while he was kayaking on the Willamette River.

### A. Allegations of Dr. Jackson's State Court Complaint

The following allegations are set forth in Dr. Jackson's state-court complaint. Jones Decl. ¶ 2, Ex. 1 (Complaint, *Jackson v. Marion County*, No. 25CV10925 (Marion Cty. Cir. Ct.) (filed Feb. 20, 2025) (referred to herein as "State Complaint")).

On June 20, 2024, Dr. Jackson and Claimant Alex Woolner were kayaking on the Willamette River near Buena Vista Park. State Compl. ¶ 10. Dr. Jackson was using a kayak owned by Mr. Woolner; the kayak was yellow and approximately 14 feet long. State Compl. ¶ 9. Mr. Woolner was paddling in a separate kayak.

Dr. Jackson and Woolner entered the river at a ramp at or near Buena Vista Park and proceeded to lawfully kayak downriver. They approached the crossing of the *Buena Vista* ferry, which is owned and operated by the County. State Compl ¶¶ 5, 10. With the kayakers in full view, the *Buena Vista* started across the river, did not yield to the kayakers, and collided with Dr. Jackson's kayak. State Compl. ¶ 10. Dr. Jackson became submerged and drowned by the ferry's propellers. State Compl. ¶ 10.

Claimant Jackson, as personal representative of the estate of Dr. Jackson, filed the State Complaint on February 20, 2025. In it she alleges claims for negligence, negligence per se, and wrongful death against the County and Claimant Woolner. *See* Compl. ¶¶ 1–21. With respect to the *Buena Vista*, Claimant Jackson alleges that

> At all times mentioned, the Buena Vista ferry was afloat and underway
> upon navigable waters of the Willamette river, within the territorial waters of the

state of Oregon.  The Buena Vista ferry was and is owned and operated by Marion County.  The Buena Vista ferry travels across the Willamette river and is powered by two electric motors with propellers external to the ferry.

State Compl. ¶ 8.  She further alleges that

At all times mentioned, Dr. Jackson entered the river with the kayak from the ramp at or near the Buena Vista park.  He then proceeded to lawfully kayak down the Willamette river with Mr. Woolner.  As the ferry was docked on the river's west bank and was about to start crossing the river from west to east, the kayakers approached and were within full view of the ferry operator.  The ferry had a single vehicle aboard, but nonetheless started across the river.  The ferry operator did not yield the right-of-way, colliding with Dr. Jackson's kayak, which was not under command.  Dr. Jackson became submerged under the ferry and was drowned by the ferry propellers.  Marion County was aware of similar incidents and near-misses within its Willamette river ferry system, including a similar incident that injured Jason Oliver involving the Wheatland ferry on May 1, 2022.

State Compl. ¶ 10.  On May 23, 2025, Claimant Woolner answered Claimant Jackson's State Complaint, admitting that Woolner and Dr. Jackson were kayaking on the Willamette River at the time of the incident and entered the river at or near Buena Vista Park, but denying the remaining factual allegations.  Jones Decl. ¶ 3, Ex. 2 (Answer & Affirmative Defenses, *Jackson v. Marion County*, No. 25CV10925 (Marion Cty. Cir. Ct.) (filed May 23, 2025)) (referred to as "Woolner State Answer") ¶ 10.[1]

On April 4, 2025, the County answered State Complaint, alleging that Oregon state law applies to the case:

Plaintiff's claims are governed by the substantive and procedural laws of the state of Oregon.  Accordingly, any liability imposed on defendants is several only, pursuant to ORS 31.600, 31.605, and 31.610, and plaintiff's recovery—if any—is bound by Oregon's comparative negligence scheme, ORS 31.600 *et seq*.

Jones Decl. ¶ 4, Ex. 3 (Answer, *Jackson v. Marion County*, No. 25CV10925 (Marion Cty. Cir. Ct.) (filed April 4, 2025)) (referred to as "County State Answer") ¶ 11.  The County further alleged,

---

[1]   By joining this response, Claimant Woolner does not admit to or otherwise concede any of the factual allegations set forth in the State Complaint.

PAGE 3 –   CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

In the event the Court deems general maritime law applicable, as alleged by plaintiff, defendant Marion County reserves all rights and privileges available to it under the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.*, including exoneration and limitation of liability.

County State Answer ¶ 12.

### B.    The County's Limitation Act Suit Affirmatively Asserting Admiralty Jurisdiction.

On May 9, 2025, the County invoked this Court's admiralty jurisdiction and filed this Limitation Act suit seeking protection under the Limitation of Vessel Owner's Liability Act ("the Limitation Act" or "the Act").  In its complaint, the County alleges that the suit is filed "under 46 U.S. Code §§ 30501–30530, 28 U.S. Code § 1333, Fed. R. Civ. P. 9(h) and Rule F of the Supplemental Rules for Admiralty and Maritime Claims."  ECF 1, ¶ I.[2]  The Limitation Act is a statute that would permit the admiralty court to decide whether the County committed a tort and, if so, to limit its liability to the value of the vessels (here, the *Buena Vista* and the kayak) involved if the tort was committed "without the privity or knowledge" of the vessels' owner.  46 U.S.C. § 30524(e).

The County's Limitation Act suit further alleges that

> Petitioner's filing is occasioned by a June 2024 fatal incident on the Willamette River and a related wrongful death suit, with allegations of federal maritime law, filed by plaintiff Melodie Jackson in the Oregon Circuit Court for Marion County.

ECF 1, ¶ II.  It also alleges that its complaint in this Court "follows plaintiff's allegations of navigability and general maritime law."  ECF 1, ¶ VI; *see id.* ("Plaintiff Melodie Jackson further

---

[2]    46 U.S.C. § 30502(a) provides that, "[e]xcept as otherwise provided, this chapter (except section 30521) applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters."  An action for limitation "must be brought within 6 months after a claimant gives the owner written notice of a claim."  46 U.S.C. § 30529(a).

PAGE 4 –   CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

alleges in her Circuit Court lawsuit that the June 2024 incident occurred on navigable waters and that general maritime law applies to her claims.").  The County states that it is entitled, "in the event federal maritime law is deemed applicable, to complete exoneration and otherwise limitation of liability for any loss or damage resulting from the June 2024 incident."  ECF 1, ¶ VIII.

In its request for relief, the County alleges that the *Buena Vista* has been surveyed and valued at $1,325,000 and, though its complaint, requests that this Court accept its undertaking as security for the value of the *Buena Vista*, direct the issuance of a monition, and order any persons with claims arising from the kayaking incident to file those claims in this Court:

> WHEREFORE, Petitioner Marion County prays for the following relief:
>
> 1.      That the Court accept and approve the Letter of Undertaking in the sum of $1,325,500 as security for the value of the BUENA VISTA vessel and $500 costs, with interest at 6% per annum from the date of filing, as required under SAR F(1) and LR 1020-2.
>
> 2.      That the Court enter an Order directing the issuance of a Monition to all persons claiming damages for any and all loss or damage occasioned or incurred by or resulting from the June 2024 incident, citing such persons to appear before this Court to file their claims, serve on the Attorneys for Marion County a copy thereof on or before a date to be given, answer the allegations of this Complaint or forever be barred from making or otherwise pursing any such claims against Petitioner, its agents, representatives, crew or any other person on whose behalf Petitioner may be liable or against the BUENA VISTA, all as provided by law and the Supplemental Rules for Admiralty and Maritime Claims and the rules of this Court.

¶ XV; *see also* Ex Parte Motion for Order Approving Security for Limitation and Costs, Directing Monition and Issuing Injunction, ECF 2, at 3 (invoking "46 U.S. Code § 30501, et seq., 'Exoneration and Limitation of Liability,' [which] permits an owner of a vessel to file an action to exonerate itself of liability or, alternatively, to limit its liability to the value of its vessel where a loss occurred without the owner's privity or knowledge").  In doing so, the County sought to " 'protect [its] absolute right to claim [the Limitation Act's] liability cap, and to reserve

PAGE 5 –  CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

the adjudication of that right in the federal forum.' " ECF 2, at 3 (quoting *In re ADM/Growmark River Sys., Inc.*, 234 F.3d 881, 885 (5th Cir. 2000)).

On August 19, 2025, this Court entered the order that the County requested—approving the sum and security submitted for the *Buena Vista*, directing the issuance of the monition, and issuing an injunction "prohibiting, restraining, and staying both the institution and the further prosecution of any and all suits or actions or other legal proceedings of any character whatsoever in any court whatsoever (except only in this proceeding and this Court), against Marion County based on or connected with any claim directly or indirectly related to the June 20, 2024, incident as described in the Complaint." ECF 9, at 3 (¶ 4). The clerk issued the monition the same day. ECF 10. As a result of that injunction, the state court case was stayed.

On September 17, 2025, Claimant Jackson filed an Answer and Claim on behalf of Dr. Jackson in this Court. ECF 11, 12. On October 17, 2025, Claimant Woolner filed an Answer, Affirmative Defenses and Claim seeking contribution and indemnity from the County. ECF 13 (Woolner Answer ¶ 10). On October 22, 2025, Marion County moved to dismiss its own complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), arguing that the Court lacks subject matter jurisdiction over the action that Marion County itself filed.

Separately, Claimant Woolner has filed a Limitation Act complaint in this Court, captioned *In the Matter of: The Complaint & Petition of Alex Woolner, as Owner of 2013 Looksha 14 Kayak, for Exoneration from or Limitation of Liability*, No. 6:25-cv-01395-MC (filed Aug. 7, 2025) (referred to hereafter as *Woolner*). This week, the County filed an Answer and Claim in that proceeding seeking contribution and indemnification from Mr. Woolner. *Woolner*, ECF 21, at 6 (Answer ¶ 2(c)). In an about face from its own Limitation Act suit, the County's Answer filed in *Woolner* denies that this Court is the appropriate venue in which to adjudicate this case; the Answer goes so far as to allege that Woolner "is barred from

exoneration or limitation of liability because the Incident is not governed by maritime law and this Court lacks 28 U.S. Code § 1333 subject matter jurisdiction." *Woolner Woolner*, ECF 21, at 6 (Answer ¶¶ 2, 6, 7 & 8).

## II.    LEGAL STANDARD

Federal courts have original subject matter jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction."  28 U.S.C. § 1333(1).  A party seeking to invoke admiralty jurisdiction over a Limitation Act suit must establish: (1) "whether the tort occurred on navigable water," and (2) whether the tort has a "connection with maritime activity."  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995) (internal quotation marks and citations omitted).

## III.    ARGUMENT

Marion County did not just protect the statute of limitation when it filed this Limitation Act suit.  It also affirmatively asserted admiralty jurisdiction, and then successfully persuaded the Court to issue an order foreclosing Claimant's jury rights and barring her from suing the County in state court.  Having issued that order, this Court has already decided that admiralty law applies.  *East River S.S. Corp. v. Transam. Delaval Inc.*, 476 U.S. 858, 864, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law.").  The County should not now be allowed to reverse course and argue that the Court has no power to proceed.

Although disguised as a jurisdictional challenge, the County is effectively asking the Court to make a choice-of-law ruling on the merits, while at the same time disputing its very power to do so.  Such an argument undermines the integrity of the judicial process and is the very type of argument that the doctrine of judicial estoppel was designed to prevent.  Having invoked this Court's jurisdiction, the County should be estopped from factually challenging it.

Additionally, to the extent that the County seeks to use Rule 12(b)(1) to dismiss its own petition, the motion is procedurally improper.  And in all events, admiralty jurisdiction exists because the tort occurred on navigable water and has a connection with maritime activity. The County's motion to dismiss should be denied.

A.    **The County is judicially estopped from factually challenging navigability.**

"Judicial estoppel, sometimes known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir.1996).  Judicial estoppel is invoked "not only to prevent a party from gaining an advantage by taking inconsistent positions," but also "because of 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.' " *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir.2001) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990)).

Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S. Ct. 555, 39 L. Ed. 578 (1895).  The doctrine "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000); *see* 18 Moore's *Federal Practice* § 134.30, at 134–62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding"); 18 Charles A Wright,

PAGE 8 –  CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

Arthur R. Miller, & Edward Cooper, *Federal Practice and Procedure* § 4477, at 782 (1981) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory").[3]

True, judicial estoppel cannot **create** subject matter jurisdiction where none exists. *See Am. Fire & Cas. Ins. Co. v. Finn*, 341 U.S. 6, 17, 71 S. Ct. 534, 95 L. Ed. 2d 702 (1951) ("Since the federal court could have had jurisdiction originally, the estoppel did not endow it with a jurisdiction it could not possess."); *Richardson v. United States*, 943 F.2d 1107, 1113 (9th Cir. 1991) (same). Nonetheless, this Court retains authority to deny Petitioner's motion on the basis that it is estopped from challenging its factual assertion of navigability at this stage.

When the County filed its Limitation Act suit, it affirmatively invoked this Court's admiralty jurisdiction, which necessarily requires that the incident occurred on navigable waters. *See, e.g.*, *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446, 121 S. Ct. 993, 148 L. Ed. 2d 931 (2001) (limitation of liability available only in admiralty); *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (party "invoke[s] the district court's admiralty jurisdiction by filing a petition for exoneration from or limitation of liability"); *see also Grubart*, 513 U.S. at 531–32.

Under the Limitation Act, a vessel owner may seek exoneration from or limitation of liability for any loss, damage, or injury by collision or other incident, happening without the owner's privity or knowledge, to any vessel or property on any navigable waters. *See* 46 U.S.C.

---

[3]   The Supreme Court has established a non-exhaustive list of factors that district courts may consider when deciding whether judicial estoppel is applies: (1) a party's later position is "clearly inconsistent" with its earlier position; (2) a tribunal accepted and relied upon the prior inconsistent position; and (3) the party maintaining the inconsistent position stands to gain an unfair advantage over the opposing party. *New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001).

PAGE 9 – CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

§ 30523. Likewise, Supplemental Rule for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supp. R.") F governs limitation proceedings and requires the petitioner to establish that the Limitation Act applies before the court will issue a monition. *See* Supp. R. F(2) ("The complaint shall set forth the facts on the basis of which the right to limit liability is asserted and all facts necessary to enable the court to determine the amount to which the owner's liability shall be limited."). Here, the County's complaint itself alleged facts that implicitly or explicitly represented that the incident occurred on navigable waters—otherwise, the County would have had no basis to invoke the Limitation Act or request admiralty relief in this Court.

In response to the County's complaint, the Court issued the very relief that the County sought: a monition directing all claims to federal court, a stay of state court proceedings, and injunctive relief—all relief available only where admiralty jurisdiction exist, and all premised on the assertion that the incident giving rise to the complaint occurred on navigable waters. Only now, after securing these substantial benefits, does the County seek to disclaim the very jurisdictional foundation it invoked and upon which this Court relied. The County is "playing 'fast and loose with the courts' "—deliberately changing positions in a way that furthers the "perversion of the judicial process." *See New Hampshire*, 532 U.S. at 750 (quoting *Stretch v. Watson*, 6 N.J. Super. 456, 469, 69 A.2d 596 (1949); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990)) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process.").

Importantly, this is not a case where a party inadvertently invoked jurisdiction and later discovered grounds to challenge it. Quite the opposite, this is a case where Marion County affirmatively sought and obtained relief from this Court, compelled claimants to abandon their state-court forum jury trial and file in federal court pursuant to court order, only to then turn

around and challenge jurisdiction. The Court should not countenance such manipulation of the judicial process.

While "judicial estoppel principles cannot conclusively establish jurisdictional facts," *In re Sw. Bell Tel. Co.*, 535 F.2d 859, 861 (5th Cir. 1976), courts may properly consider a party's inconsistent positions as part of the equitable analysis when deciding whether to entertain a belated jurisdictional challenge. *New Hampshire*, 532 U.S. at 749–51 (applying judicial estoppel where party took inconsistent positions on facts affecting jurisdiction). Here, the County's contradictory factual assertions—combined with the extraordinary relief obtained based on the initial assertion, the significant prejudice to Claimants, and the intentionality demonstrated by the timing of the County's abrupt change of course—provide compelling grounds for the Court to deny the motion.

Of course, the Court retains its obligation to independently verify subject matter jurisdiction. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006) ("[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."). In doing so, however, the Court need not consider self-serving evidence offered by the County to contradict the factual position it successfully asserted to obtain relief. Instead, the Court may properly base its jurisdictional determination on the allegations in the County's complaint, evidence offered by Claimants, and other admissible evidence in the record, without permitting the County to introduce evidence that contradicts its prior sworn position. *See New Hampshire*, 532 U.S. at 748 (declining to review and consider "New Hampshire's interpretation of the historical evidence" where prior inconsistent was sufficient to resolve New Hampshire's dispute).

**B.      Petitioner's motion is procedurally improper.**

The County's use of a Rule 12(b)(1) motion to dismiss its own complaint is also confusing and procedurally improper. Rule 12 is expressly designed as a defensive mechanism for responding parties, not as a vehicle for plaintiffs to dismiss their own complaints. *See* Fed. R. Civ. P. 12 (titled, "Defense and Objections: When and How Presented"). By its text, Rule 12 addresses how defendants and other responding parties assert *defenses*, stating that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading." Fed. R. Civ. P. 12(b); *see also* Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1342 ("The rule permits . . . one preliminary motion by the defendant, which he or she may use as a vehicle for asserting one or more of a limited set of objections. If the motion is unsuccessful, it may be followed by an answer in which the defendant may advance any defense or objection not foreclosed by having made a preliminary motion."). The County, which cannot assert defenses to its own action, cannot make use of a defensive mechanism to seek dismissal of a case that it filed. *See Feezor v. Excel Stockton, LLC*, m, at *11 (E.D. Cal. June 10, 2013) ("Although Rule 12(h)(1) permits a party to bring a Rule 12(b)(1) motion at any point and the court may consider jurisdiction on its own motion under Rule 12(h)(3), nowhere is it suggested that the opportunity to bring a Rule 12(b)(1) motion is extended to the party presenting the claim in the first place.").

The County cannot bootstrap a dismissal request into the guise of a defensive motion simply by styling it as a jurisdictional challenge. This is particularly improper where, as here, the County affirmatively invoked this Court's jurisdiction; requested and obtained a monition, stay, and injunction; and only now—after securing those rights—seek to challenge the jurisdictional foundation underlying the relief it requested and received. The procedural vehicle the County has chosen is not authorized by the federal rules and should be rejected.

PAGE 12 –   CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

C.     **Admiralty jurisdiction exists because the Willamette River is navigable.**

In any event, the County is not correct on the merits of its argument. Federal admiralty jurisdiction extends to "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl.1; *see also* 28 U.S.C. § 1333(1) (federal district courts have "original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction"); *see also Grubart*, 513 U.S. at 531–32. The Supreme Court has established a two-part test for determining whether a tort action falls within the federal courts' admiralty jurisdiction: First, the alleged tort must have occurred on or over "navigable waters." *Grubart,* 513 U.S. at 534 ("A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." (citing *Sisson v. Ruby*, 497 U.S. 358, 363, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990)). Second, the activity giving rise to the incident must have had a substantial relationship to traditional maritime activity such that the incident had a potentially disruptive influence on maritime commerce. *Id.*

1.     **The alleged tort occurred in on or over navigable waters.**

The seminal case defining navigability for admiralty purposes is *The Daniel Ball*, 77 U.S. (10 Wall.) 557 (1870). There, the Supreme Court held that waters are navigable in fact when they "are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *Id.* at 563. This test has two components: First, the waterway must be usable "in [its] ordinary condition"—meaning its natural state, without artificial improvement. *Id.* Second, the waterway must be suitable for use "as highways for commerce"—meaning capable of supporting commercial navigation in the customary manner. *Id.* "Navigability does not hinge on a particular manner or extent of use or on the absence of 'occasional difficulties in

navigation,' but rather on whether 'the stream in its natural and ordinary condition affords a channel for useful commerce.'" *Matter of Grants Pass Jetboats*, 492 F. Supp. 3d 1123, 1128 (D. Or. 2020) (quoting *United States v. Holt State Bank*, 270 U.S. 49, 56, 46 S. Ct. 197, 70 L. Ed. 465 (1926)). Importantly, the test focuses on the waterway's capacity or capability for commercial use, not whether such use is presently occurring. *See Econ. Light & Power Co. v. United States*, 256 U.S. 113, 122, 41 S. Ct. 409, 65 L. Ed. 847 (1921) (test is whether "the river, in its natural state, is used, or capable of being used as a highway for commerce," and rapids, shallow water, boulders, and obstructions do not affect a river's navigable capacity); *see also id.* ("Navigability, in the sense of the law, is not destroyed because the water course is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water."). As the Ninth Circuit explained in *State of Alaska v. Ahtna, Inc.*:

> A river's use "need not be without difficulty, extensive, or long and continuous" for the river to be a highway for commerce. [*State of Oregon v.*] *Riverfront Protection* [*Ass'n*], 672 F.2d [792,] 795 [1982] (portion of the McKenzie River found navigable when used to transport "thousands of logs," even though shallow areas and sand bars made the transport difficult). It is not essential that the river be used for the transportation of water-borne freight by a carrier whose purpose is to make money from the transportation. *Utah v. United States*, 403 U.S. 9, 11, 91 S. Ct. 1775, 1776, 29 L. Ed. 2d 279 (1971) (ranchers transporting own cattle from mainland to islands used the river as a highway). Indeed, it is not even necessary that commerce be in fact conducted: "The question of . . . susceptibility in the ordinary condition of the rivers, rather than of the mere manner or extent of actual use, is the crucial question. . . . The extent of existing commerce is not the test." *United States v. Utah*, 283 U.S. [64,] 82, [51 S. Ct. 438, 75 L. Ed. 844 (1931)].

891 F.2d 1401, 1404 (1989). Although navigability for the purpose of admiralty jurisdiction focuses on the present capability of navigability and the possibility of interstate travel by water, *Adams v. Montana Power Co.*, 528 F.2d 437 (9th Cir. 1975), historical navigability is relevant, *see Grants Pass Jetboats*, 492 F. Supp. 3d at 1126 (considering Department of State Lands' historic determinations of navigability for Rogue River).

Oregon courts historically have held that the Willamette River is navigable in fact. *See, e.g.*, *State v. Portland Gen. Elec. Co.*, 52 Or. 502, 530, 98 P. 160, 161 (1908) ("The Willamette river is a public navigable stream, a public highway, the title to the bed and banks of which is in the state, for the benefit of the public." (citing cases)); *State v. McVey*, 168 Or. 337, 340, 121 P.2d 461 (1942). And that makes sense, given the condition and flow of the waterway. Indeed, the Willamette Falls Locks—which the County argues presents an obstruction to navigation—is in fact the clearest evidence of the upper Willamette's navigability.

The Willamette Falls Locks is a six-chamber bypass canal specifically constructed to enable navigation around the 41-foot Willamette Falls. Jones Decl. ¶ 5, Ex. 4 ((Dispositional Study at 2). The locks opened on January 1, 1873, when the *Maria Wilkins* became the first vessel to navigate them. *See* ECF 16-3, at 14. The Locks can accommodate vessels up to 175 feet long and 37 feet wide. 33 C.F.R. § 207.680(b)(3).

In 1915, the U.S. Army Corps of Engineers ("the Corps") purchased the locks from Portland General Electric and operated them continuously until 2011. *See* Jones Decl. ¶ 5, Ex. 4 (Dispositional Study at 2). "From 1921 to 1989, the average annual number of lockages (*i.e.* the use of the Locks to move water, debris, and vessels downstream) exceeded 5,000 per year; the facility operated 16 hours a day and the average annual commercial tonnage through the Locks was on the order of 1.4 million." Jones Decl. ¶ 5, Ex. 4 (Dispositional Study at 2). From 1989 to 1996, there was a significant decline in lockages because of a decline in log rafts through the Locks. Jones Decl. ¶ 5, Ex. 4 (Dispositional Study at 3). By 1999, less than 1,000 tons of commercial goods were transported through the Locks. Jones Decl. ¶ 5 Ex. 4 (Dispositional Study at 3). The Locks continued to be operational, however. The Corps' century-long ownership and operation of the Locks demonstrates that the waterway above Willamette Falls certainly is navigable, requiring federal navigation infrastructure. The Locks were added to the

PAGE 15 – CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

National Register of Historic Places in 1974 and "are a rare surviving example of early to mid-nineteenth century bypass canal and lock construction." Jones Decl. ¶ 5, Ex. 4 (Dispositional Study at 2).

True, the Locks were closed in 2011 due to deferred maintenance,[4] but that closure does not destroy navigability. As the Supreme Court has made clear, temporary interruptions do not eliminate a waterway's navigable character. *See Econ. Light & Power Co.*, 256 U.S. at 122–23 The test, again, is whether waters are **capable** of being used for commerce, not whether they are currently or presently in use. In arguing the opposite, the County ignores the well-settled standard for navigability established in *The Daniel Ball.*

Without question, the Willamette Falls Locks are capable of being used for commerce. Indeed, after the Locks were nominally closed in 2011, they were opened again in both 2011 and 2013, once for the very vessel involved in this case. In 2011, they were opened to allow the Buena Vista through the Locks on its way to its current location. *See* Jones Decl. ¶ 6, Ex. 5 (Sandy Carter, *Willamette Falls Locks open briefly to let new ferry through*, OregonLive (May 20, 2011, 8:23 PM), https://www.oregonlive.com/oregon-city/2011/05/willamette_falls_locks_open_briefly_to_let_new_ferry_through.html (last visited Nov. 12, 2025)). And in 2013, the Lock were opened for the Canby Ferry to pass through for

---

[4]    As explained in the Corps' Dispositional Study the Locks were "placed in 'Caretaker' status in 2006 due to the persistent decline in commerce moving through the Locks." Jones Decl. ¶ 5, Ex. 4 (Dispositional Study at 3). They were evaluated in 2011, which revealed structural deficiencies resulting from corrosion in the miter gate gudgeon anchors. *Id.* The Locks were later closed by the Corps due to these safety concerns. *Id.* Nevertheless, every two months, the Corps performs a full function test of the gates by cycling them through open and closed to ensure their continued operation. *Id.* at 32.

PAGE 16 – CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

repairs in Portland, Jones Decl. ¶ 7, Ex. 6.[5]  The ferry returned upstream through the Locks six months later.[6]

There is also an ongoing, extensive effort to restore the use of the Locks, further evidencing its capability of use for commerce.  *See, e.g.*, Jones Decl. ¶ 5, Ex. 4 (Disposition Study at 11, 24).  In 2021, the Oregon legislature established the Willamette Falls Locks Authority as a public corporation with the mission to "establish ownership, oversight and management of the Willamette Falls Locks project, for the purposes of [e]nhancing the economic vitality of Oregon through facilitating the resiliency and navigability of the Willamette River [and r]epairing, maintaining, upgrading and operating the Willamette Falls Locks project and associated properties and facilities for commercial, transportation, recreational, cultural, historic, heritage and tourism purposes."  House Bill (HB) 2564 § 2(3)(a)–(b) (2021).[7]  At the same time, the state committed $7.2 million in lottery bond funding for the repairs necessary to reopen.  The Willamette Falls Locks Authority, in its 2024 Update, has stated that it anticipates transferring the Locks from Corps ownership by 2027, and that it continues to work toward securing the funding necessary to complete the upgrades, "promot[ing] commercial use of the locks through collaboration with economic development entities, tourism and private industry," and "return[ing] operational locks to the community."  Willamette Falls Locks Authority, 2024

---

[5]     *See* Jones Decl. ¶ 7, Ex. 6 (Molly Harbarger, *Willamette Falls Locks open briefly after a year of negotiation to allow Canby Ferry, tugboats through*, OregonLive (Jan. 8, 2013, 10:46 PM), https://www.oregonlive.com/west-linn/2013/01/willamette_falls_locks_open_br.html (last visited Nov. 12, 2025)).

[6]     *See* Jones Decl. ¶ 8, Ex. 7 (Molly Harbarger, *Willamette Falls Locks to open briefly to allow Canby Ferry to return upriver*, OregonLive (July 15, 2013, 10:43 PM), https://www.oregonlive.com/west-linn/2013/07/willamette_falls_locks_to_open.html (last visited Nov. 12, 2025)).

[7]     A copy of the enrolled version of HB 2564 is attached as Exhibit 8 to the Jones Declaration.

Update, *available at* https://www.willamettefallslocks.org/document-library (last visited Nov. 10, 2025).[8]  The funding that has been committed to reopening the Locks currently totals $19 million.[9]

Consistently with the Lock Authority's update, the reports that the County offers make clear that the Corps' preferred alternative is to complete the necessary repairs and leave the locks in place until a purchaser/transferee can be secured.  The reports also highlight that, as part of that "preferred alternative," the measures the Corps takes would "not impede future owner/operators from returning the facility to operability."  *See* Jones Decl. ¶ 5, Ex. 4, at 106 ("Willamette Falls Locks Willamette River Oregon Section 216 Disposition Study with Integrated Environmental Assessment").  The report goes on:

> This alternative consists of minimal repairs required from a federal perspective to address the planning constraints, assuming the future owner/operator continues the base Caretaker maintenance actions for the non-operational condition of the Locks. These measures address immediate safety and environmental hazards and allows adjoining property owners to continue their operation with minimal or no impacts. This alternative includes Seismic Partial and Safety Minimal measures. The risks associated with operating the Locks as a navigation passage without repairing the critical deficiencies would be passed on to the transferee with all available known information and proposed facility modifications to mitigate these risks.
>
> . . . .
>
> Under this alternative the preferred method of conveyance would be to convey the real property interests to an identified non-federal transferee, once developed, as it would allow the Corps to comply with Executive Order 13287. This Executive Order directs that the Corps, where consistent with its mission and governing authorities, shall seek partnerships with State and local governments, Indian tribes, and the private sector to promote local economic development and vitality

---

[8]    In 2025, the Oregon legislature failed to pass a bill that would fund the completion of the recommended maintenance.  *See* House Bill 2574 (2025).

[9]    *See* Jones Decl. ¶ 10, Ex. 9, Holly Bartholomew, *Willamette Falls Locks take a hit with no new funding from the Legislature*, OPB.org (July 21, 2025, 6:00 AM), https://www.opb.org/article/2025/07/21/willamette-falls-locks-navigational-boats-infrastructure-seismic-earthquake/ (last visited Nov. 12, 2025).

PAGE 18 –  CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION COUNTY'S MOTION TO DISMISS

through the use of historic properties in a manner that contributes to the long-term preservation and productive use of those properties. Such a partnership is a goal of the Willamette Falls Working Group.

Jones Decl. ¶ 5, Ex. 4, at 106–08.

Finally, the Corps and the Oregon Department of State lands both consider the Willamette River to be a navigable waterway between Portland and Eugene. *See* U.S. Army Corps of Engineers—Portland District, Navigable Waters List (Oct. 1993) (attached as Exhibit 10 to the Jones Decl.); Or. Dep't of State Lands, Oregon-Owned Waterways List (June 6, 2024) (attached as Exhibit 11 to the Jones Decl.). "Courts may also consider determinations of navigability made by state governments and federal agencies like the Coast Guard, although such determinations are not dispositive. *Grants Pass Jetboats, Inc.*, 492 F. Supp. 3d at 1130 (citing *Sawczyk v. U.S. Coast Guard*, 499 F. Supp. 1034, 1039 (W.D. N.Y. 1980) ("Although these determinations are not controlling, they are not without significance and may be taken into account by the court in determining whether the Niagara is navigable.")). And here, because the incident giving rise to this case involved a commercial vessel on a navigable waterway, the U.S. Coast Guard also investigated the incident. *See* U.S. Coast Guard, *Navigability Determinations for the Thirteenth District* (undated) (attached as Exhibit 12 to the Jones Decl.); see also Sweeney Decl. ¶¶ 4–5.

The Willamette River—both upstream and downstream of Willamette Falls—is a navigable waterway. "A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken." *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407, 61 S. Ct. 291, 85 L. Ed. 243 (1940), *superseded on other grounds by statute as stated in Rapanos v. United States*, 547 U.S. 715, 126 S. Ct. 2208, 165 L. Ed. 2d 159 (2006). The existence and ongoing maintenance of the Willamette Locks demonstrate that the upper

Willamette River is capable of being used for commerce, Sweeney Decl. ¶¶ 6–7, and that permanent navigation infrastructure was built to constructed, and remains in place, to further that capacity. The upper Willamette River is a navigable waterway.

### 2. The alleged tort occurred in on or over navigable waters.

The activity giving rise to the incident in this case also has a substantial relationship to traditional maritime activity. *See Grubart*, 513 U.S. at 534. The Supreme Court has held that, although pleasure boating is not itself maritime commerce, pleasure boat accidents have a significant relationship to traditional maritime activity because of "[t]he potential disruptive impact [upon maritime commerce] of a collision between boats on navigable waters." *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675, 102 S. Ct. 2654, 2658, 73 L. Ed. 2d 300 (1982). Because a collision between two recreation vessels meets the standard of a substantial relationship to traditional maritime activity, the collision in this case—between a recreational vessel and the Buena Vista Ferry—also satisfies that standard.

## IV. CONCLUSION

For the reasons set forth above, Claimants respectfully request that the Court deny the County's motion to dismiss.

DATED this 12th day of November, 2025.

SUGERMAN DAHAB

By: /s/ Nadia H. Dahab
**Nadia H. Dahab**, OSB No. 125630
101 SW Main Street Suite 910
Portland, OR 97204
Tel: (503) 228-6474
Fax: (503) 228-2556
nadia@sugermandahab.com

**Tim Jones**, OSB No. 890654
TIM JONES P.C.
2855 NW Crossing Dr., Suite 213
Bend, OR 97703
Tel: (503) 374-1414
tim@timjonespc.com

**Daniel Weltin**, CSB No. 226600 (admitted *pro hac vice*)
LAW OFFICES OF DANIEL WELTIN P.C.
777 Davis St., Suite 146
San Leandro, CA 94577
Tel: (510) 856-4421
daniel@danielweltin.com

*Attorneys for Claimant Melodie Jackson*

**Mary Erica Aquadro**, OSB No. 160607
**Megan S. Cook**, OSB No. 095711
LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, OR 97204
Tel: (971) 344-7031
erica.aquadro@lewisbrisbois.com
megan.cook@lewisbrisbois.com

*Attorneys for Claimant Alex Woolner*

PAGE 21 –  CLAIMANTS' JOINT RESPONSE IN OPPOSITION TO PETITIONER MARION
COUNTY'S MOTION TO DISMISS